Good morning, your honors. My name is Richard Hamlisch. I represent the 80-odd plaintiffs of Clifford Lewis being named defendant, top name defendant. A couple of things I want to make clear before I get into the main part of the argument. This case is not about a membership in the tribe. Some of these plaintiffs have been in other cases, the Norton case, the Alvarez case, and it's always been about membership in the tribe. I have not taken a case before this court or the district court which involves membership. These plaintiffs are not seeking membership in the tribe through this case. Secondly, in the brief of the appellas, one of them, they said that there's been a complaint, a first amended complaint and a second amended complaint and we've had three tries and we haven't been able to satisfy the court. That's not completely true. I filed a complaint with the stipulation with counsel. I filed a first amended complaint to make some changes and add some plaintiffs. There were no substantive change in the complaint. When the court granted the 12B6 motion to begin with, I filed a second amended complaint. So really we're talking about two complaints, not three. This case is really about property rights and the deprivation. What property rights is this case about? Land. What land? Real property. What real property? Pardon? I'm not at all clear that it is about real property. That's why I want to know. What real property is it about? Well, it's about what is called the community property or the association which was formed in 1958 by the act of 1958, the Termination Act. And I think we have to go into the history of why that took place. We only have ten minutes. Let's go on. Go ahead. But all the people, all the Indians who lived on Table Mountain were part of a community. Not all of them were members of the tribe. They were all Indians, but not necessarily members of the tribe. So there's a distinction between the two. In 1958, the government terminated the status as Indians. And with that went health benefits, medical benefits, housing, all the preferential affirmative action that the government had been doing since 1916, they wanted to terminate because it wasn't working. It was the right thing to do, but the wrong way to do it, but that's another point. The who got land in 1958 was very interesting. You're not claiming a right to have gotten land in 1958 by your plaintiffs, are you? No. Well, no, we're not. What we're saying is... We don't know exactly what land you're arguing. What property it's about. They're entitled to the portion of the community lands that were not allocated to individuals in 1958. That's what my client... It wasn't allocated to them, though, either, right? Pardon? It wasn't allocated to them. Well, it was allocated to them as members, as part of the community, which was the association. The association was formed to manage the land, the sanitation, the water, the roads, take over as the government, so to speak, not the tribe. That was not designated to the tribe. It was designated to the association, two different things. Elsewhere, you say that the association is essentially the governance of the tribe, which is what they say, but you say it, too. No, the governance of the tribe runs the tribal business. The association runs the land. They're two entirely different organizations. The tribal votes on whose council it is. They make their laws. They decide who their membership is. Who owned that land during that period? Who owns the land? That land. The community land? The association. And the association is made up of all the people who lived on the land or had rights to the land either at 1958 or prior to 1958. Let me just ask you a couple other questions, see if we can find out what the issues are in this case. You don't, in your brief, challenge the holding that the federal government has sovereign immunity here. Is that right? I'm sorry? You don't challenge the holding that the federal government has sovereign immunity in this case. So is that a given and out of the case? Is that true out of the case? In so far as money damages. Right. Right, but not as far as equitable relief. Okay. And what equitable relief are you asking for against Salazar? Health care, housing, employment. All the benefits that we have been associated with affirmative action for the last 40 or 50 or 60 years. The Indians were afforded that long before any other groups that were minority groups in the country, and rightfully so. But those personal rights, if you want to, if you want to distinguish between real property and personal property, those other rights were taken away in 1958, although nothing was given in exchange to other than the eight people who got land. So the 550 people who lived on that land, of which my clients represent 100, were out. They had no benefits. They had no property. And they had no notice of what went on. I mean, that's an issue that Corporal Judge Wenger asked, you know, what about the notice to these people? The notice was printed in the Mountain News. It's a paper that has 250 circulation printed in Prather, California. Prather, California was in 1958 a gas station, a grocery store, and a post office box. The paper was a throwaway. It went in the corner in the store, and nobody read it. But that's where the notice was put. And this is what all the people in Table Mountain and Prather Mountain was now in Table Mountain. But all these people were living in this tiny little community, and isn't there a good implication that they knew exactly what was going on? Pardon? Isn't there a pretty good implication that they knew exactly what was going on? No. This was done in San Francisco. This was not the proceedings for this 1958 termination was done in San Francisco. And the 1983 block case. I think the question is, isn't this a practical matter? Pardon? I think the question is, isn't this a practical matter? Some of the likelihood that, in fact, people became aware of what had happened, particularly if they were to lose their benefits and so forth, why weren't they on notice of that in a de facto way? I'm not sure how to answer that question, Your Honor. But when I took this case on, there was a meeting of all my clients, and there were people in that room who were not aware of what happened in 1958. They were not aware of the Watt decision. They weren't aware of the consequences? No. What they lost? They were farmers. They lived out there. They had no idea what was going on, lived their life. And their grandchildren don't know. Has there been an evidentiary hearing at this point? No. On that issue? Absolutely not. And that's what was unifying. The point of your contentions is that the dismissal was premature because they should have been on the equitable tolling question. They ought to have had a chance to come in and say, Judge, we really didn't know. Well, that's what I did at the hearing on the motion. It was denied. The issue of the land or the association is very interesting because in the Watt decision in 1983. You're very close to out of time. Pardon? You're very close to out of time, so please wrap up. All right.  And that's clear in the appellee's brief as well as my brief. Secondly, in the order of the court in the Watt decision, the tribe transferred the land to the government. The tribe didn't own the land. The document is unenforceable. I would like to just end by talking about the statute of limitations. The statute of limitations is absolutely clear, whether it's the Oneida 2 case or whether it's 2415C, I believe it is, that says there shall be no statute of limitations as to personal or real property. And that's all they talked about in the court below was statute of limitations, six years, two years. The district court judge asked me over and over again which statute of limitations applies. None because 2415C says specifically there is no. Relating to what? Relating to Indians? Relating to anybody? Relating to? Pardon? What is 2415C about? 2415C is Indian land claims. Pardon? Indian land claims or? Yeah. Why don't you tell us when you come back, okay? Well, it basically says that any claims, there should be no time limit on any claims for property or real or personal. For whom? For the Indians. It's in section title 28. And it's cited in my, oh, here it is. It's cited in my reply brief at page 4 of 23. And nothing herein shall be deemed to limit the time for bringing in action to establish the title to or the right of possession of real or personal property. 28 U.S.C. 2415C. Thank you very much. But, thank you. We'll give you a minute. May it please the court. Edward Olson from the U.S. Attorney's Office on behalf of the Secretary of the Interior. I'm not sure if the panel has a preference from whom it wished to hear first. Why don't we start with the government and are you dividing time in half or how are you doing it? We are. Okay. Taking five minutes. Briefly, the district court's order can be affirmed for three different reasons. First of all, appellants have not contested the district court's sovereign immunity determination. Sovereign immunity isn't even raised. The phrase is not used in the opening brief. I did hear an argument raised for the first time in the reply brief and hear that they're seeking non-monetary relief. And I guess that's in response to the government's contention that although 5 U.S.C. Section 702 provides a limited waiver of the government's sovereign immunity, that only applies to claims seeking non-monetary relief. But the complaint itself couldn't be more clear that plaintiffs and appellants are seeking only general damages and punitive damages and that's expressed in the end of the plaintiff's prayer for relief and that's at ER 402 if that doesn't apply. The district court's order can also be affirmed. Although the district court didn't get to that issue, the district court's order can be affirmed on statute of limitations grounds 28 U.S.C. Section 2401, bars claims against the United States unless brought within six years of when the claim accrues. And although it's very difficult to decipher the second amendment complaint, with all due respect, all of those claims arose many, many years ago. Briefly before I go. What about the statute that he's signing? Does that have anything? I'm sorry. Does the statute that he's signing have anything to do with anything? Does the statute? That he's signing. Statute of limitation. No, no, no. That statute 2415 governs claims brought by the United States on behalf of Indian tribes. It's not the case here. It also governs property rights and here what plaintiffs are seeking is not, I think under any reasonable interpretation of the second amendment complaint, property. What they're saying is that they've been deprived of benefits that the tribe has garnered via the use of that property over several years. But this is not an action seeking a determination that this is our property. In any event, I think the case. We have a third reason. I'm sorry, Your Honor. We have a third reason. The third reason, and I'll submit, is a failure to state a claim. The district court, I think, was very patient. Gave plaintiffs a number of opportunities to amend their complaint and it's still very difficult to figure out what they're alleging. The Snyder Act is mentioned. The Snyder Act doesn't provide a private right of action. The complaint doesn't articulate what services, benefits, programs. They were deprived of at what periods, by whom, which plaintiffs were deprived of what benefits, programs, services, at what time, whether they submitted applications. And the district court advised plaintiffs at the hearing on the first amendment complaint that there were deficiencies and he would give plaintiffs one more opportunity to remedy those deficiencies. Didn't do so. There's also a claim, apparently under the Indian Child Welfare Act, but although the district court said, I fail to understand the connection between child welfare statutes and what you're claiming here, that wasn't remedied in the second amendment complaint. And then finally, it appears that there's a private right of action that was attempted to be asserted under the California Manager Rehab, but there's no language in that statute which can be fairly read as creating a private right of action, Your Honor. So for those three independent reasons, the government would ask the court to affirm the district court's order dismissing the claims against the Secretary. And with that, I'll turn it over to Mike. Thank you. May it please the court, Ian Barker for Tribal Defendants at Belize. Your Honors, it's not surprising that this court has three times, has twice before decided not to intervene in this suit to challenge the way in which a sovereign Indian tribe distributes property to its members. First, as the district court correctly found, plaintiff's claims accrued decades ago and have long been time barred. Second, as this court recognized in Lewis v. Norton, claims challenging internal tribal affairs cannot survive the double jurisdictional whammy of sovereign immunity and lack of federal court jurisdiction to intervene in tribal membership disputes. Now, looking particularly at the time bar issue, plaintiff's opening brief doesn't challenge the district court's rulings that their claims necessarily accrued decades ago. Now, as Your Honors recognized, it's simply implausible that these plaintiffs could have been evicted from their land could have lost the services that they claim to have lost and that they've been trying to fight for, in their words, 28 years to reclaim these services, but yet that they wouldn't be on notice that they'd lost these property rights and that they would have had these claims. So, because the state law claims... Why were they evicted from land? Well, Your Honors, that's not clear, but I understand plaintiff's theory is that when the United States came in and administratively selected the tribal defendants as the users of the land, I understand their theory is that tribal defendants then went and forcibly removed the other individuals who were on the land and for some reason hadn't been... It was 1958, not 24 years ago. That would have been as a result of the 1958 action. Right, that was in 1958. What about the Oneida claim? Your Honor, there's simply no common law claim for Indian property here. First of all, that wasn't raised until appeal, and if you look at the claims in the second amended complaint, they're pretty clearly statutory claims. And if you look at particularly what was at work in Oneida, in the Oneida 1 case, or as plaintiffs characterized... Let me start with the Oneida 2 case. Plaintiffs say that they can state a claim for rights based on aboriginal title or based on treaty, statute, or other form of government action. Yet they fail to identify anything that fits into any of those categories that would support relief. They would say the settlement. They might say, Your Honor, that the Watt settlement created rights in their favor, but the district court admonished the plaintiffs when it first dismissed their first amended complaint that they should identify language in Watt that created rights in their favor. And quite simply, there's nothing in Watt that creates rights in anyone but the administratively selected users of the land. It allows the administratively selected users of the land to transfer land that they own to the United States to be held in trust and permits the association to transmit land that it owns to trust for the benefit of the entity of its choice. The only thing that would arguably benefit the plaintiffs here is a provision of the Watt settlement that allowed for any Indians who lost their status as a result of the distribution to retain their status of Indians, to regain that status that they had lost. But here, there's no claim by plaintiffs that they were distributees, and only distributees under the Act were supposed to have lost their Indian status. And in any event, nothing under the Watt stipulation conflates Indian status with tribal membership status, which is essentially what plaintiffs are seeking here. If we were to construe Oneida as creating some kind of common law claim in favor of individual Indians who believed they had been left out of a restoration of a tribe, not only would it be inconsistent with Santa Clara Pueblo's admonishment against creating common law rights of action that infringed on tribal sovereignty, but it would be inimical to the purpose of restoring these tribes in the first place. In any event, even if you go through each of the other categories, if they were to claim an aboriginal right, there's simply no aboriginal right, because any aboriginal right would have been destroyed by the distribution of the land in 1958, or by the United States taking it into trust in 1984 after the Watt settlement. Because the United States has plenary power to act in terms of Indian affairs, and when land rights are taken by the United States, when it's just a right to occupy, taking those rights does not give rise to any right under federal law, and that's in the Tihetan Indians case versus the United States. And then in addition, it's pretty well covered in the briefs, but sovereign immunity covers any acts by tribal officials governing an Indian tribe. I think the governing case there is... One last thing. What about this contention that the association and the tribe are separate entities entirely, and the association essentially is composed of non-member Indians as well as member Indians? Well, first of all, Your Honor, it's undisputed in the record that since the land was taken into trust in 1984, it's been held by the United States for the Table Mountain Rancheria. So since that time, any actions toward that land have certainly been acts of the tribal government. Beyond that, even if the claims before that were not time-barred, what Watt established and what the settlement of Watt established was that the association never lost its status as a federally recognized tribe, and so therefore the actions of the association, even if they were timely as related to the property before 1983, would be protected by the tribe's immunity as well. So you're saying the association is the tribe? We're saying the association is the tribe, and the plaintiffs in all of their complaints have made allegations to that end. Okay. Thank you very much. Thank you, Your Honor. Thank you for your argument. I'll give you a minute, and we'll vote. I'm not sure where to start. Counsel made an interesting statement, and it's reiterated in his briefs, and he said they were the tribal members, the people who got land were selectively, administratively selected. The Termination Act of 1958 gave to the power to the Indians to elect, to give up anything they had and get off the rolls as being an Indian and being treated like any other American. It was not a selection process. It was an election process, whereas what really happened is it was a selection process by their own admission, and they didn't give notice to anybody else, and whoever it was, and of course we know who it was, selected seven or eight or nine people, families, totaling 55 people, and took Table Mountain, whatever the good land was, and they took it for themselves, and the balance became the association. The association has nothing to do. It is a private entity by their own brief. It is a private entity separate and distinct from the tribe. It is not the tribe. Okay. Thank you very much, and thank you for your argument. Yes. One last thing. There's an immunity issue here, and apparently counsel doesn't understand 1983 or Billings. Well, 1983 is not in this case because we're here. I understand. All right, but thank you. Your time's up. Thank you very much. The case of Lewis v. Salazar is submitted.
judges: Carr, Berzon, Watford